# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| VICTORIA PIERCE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CAUSE NO.: 1:16-CV-426-TLS |
| FORT WAYNE HEALTHCARE GROUP, LLC, | ) ) ) ) |
| Defendant. | ) ) |

## OPINION AND ORDER

The Plaintiff, Victoria Pierce, is pursuing claims for discrimination against her former employer, Fort Wayne Healthcare Group, LLC. She alleges that the Defendant terminated her employment because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and because it perceived her to be disabled, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq.*[1] The Defendant maintains that the reason it terminated her employment was because she violated the strict attendance policy that applies to employees during their first ninety days of employment. The Defendant has moved for summary judgment, asserting that the Plaintiff cannot show a genuine issue for trial. The matter is ripe for this Court's review.

## FACTUAL BACKGROUND

The Defendant owns and operates Grey Stone Health and Rehabilitation Center, an extended care facility in Fort Wayne, Indiana, that offers skilled nursing care and rehabilitation

---

[1] The Plaintiff "concedes that she did not exhaust her administrative remedies as to a claim of retaliation pursuant to Title VII," and asks the Court to dismiss the retaliation claim. (Pl's Br. 1, ECF No. 28.)

services. An Administrator oversees the entire facility and its staff. The Director of Nursing, and Assistant Director of Nursing oversee the nurses and certified nursing assistants. There is also a supervising nurse on duty during each shift.

The Plaintiff has twice worked for the Defendant as a Certified Nursing Assistant (CNA). Both periods of employment ended before the Plaintiff completed the ninety-day probationary period. After the Plaintiff's first period of employment ended on December 10, 2014, the Plaintiff reapplied, unsuccessfully, for a CNA position with the Defendant. However, in March 2016, the Director of Nursing, Regina Baumgartner, rehired the Plaintiff for a full-time, third shift position. Baumgartner prepared a written note stating that her review of the Plaintiff's file revealed that the Plaintiff should not have been designated as non-rehireable for her December 2014 termination. Specifically, she noted that the Plaintiff had not been aware of, and had not signed, the write-ups that led to her termination because she went to the emergency room and was not present at work.

The Defendant requires full-time CNAs to work every other weekend. The Plaintiff understood this requirement. Upon her rehire, the Plaintiff also received a copy of the Defendant's Employee Handbook and Attendance Policy. The Handbook included an Attendance Policy, which defined an absence as "the failure of an employee to report for work when the employee is scheduled to work or failure to work **ANY** scheduled shift (including shifts that an employee voluntarily picks up for vacancies/call offs)." (Saber Heathcare Group Facilities Attendance Policy, Pl.'s Dep. Ex. I, ECF No. 24-3 at 88.) Additionally, "[a]n absence occurs when it is necessary for you to be absent or late for work because of illness or an emergency." (*Id.*) The Attendance Policy also states, "[a]ny employee who fails to report to work

2

without notification to his or her supervisor for a period of one day will be considered to have voluntarily terminated their employment." (*Id.*) The Policy contains specific requirements for employees who are in the first ninety days of employment:

> **90 day Probation Period** – The first absence within an employees [sic] first 90 days will result in a verbal warning. The second absence within an employees [sic] first 90 days will result in a written/FINAL WARNING. The third absence within an employees [sic] first 90 days will result in **immediate termination** of employment.
>
> One NO CALL NO SHOW will result in **immediate termination**.

(*Id.*, ECF No. 24-3 at 89.) The only absences that do no count against attendance during the probationary period are those for "bereavement, jury duty, or FMLA." (*Id.*)

The Plaintiff was scheduled to work on March 29, 2016. Before her shift began, the Plaintiff received a call from BioLife about plasma that she had donated. BioLife informed the Plaintiff that her recent donation did not pass a laboratory screening test, and requested that she come to its facility for more information. The Plaintiff went to BioLife and was informed that the screening had tested positive for HIV. BioLife referred the Plaintiff to her medical provider to follow up with additional testing to confirm her HIV status. Shaken by the news, the Plaintiff called the Defendant and spoke with the scheduler to say she would not be working her shift. The absence counted as the Plaintiff's first absence during her probationary period.

Two to three weeks later, the Plaintiff informed Jim Chin, her third shift supervisor, that she might be infected with HIV, and that she wanted to inform the Administrator, Fred Taylor. Chin suggested that the Plaintiff wait to speak to Taylor until her diagnosis was confirmed. Although she still did not have confirmation a week or two later, the Plaintiff told Taylor about her situation. Taylor assured the Plaintiff that she would not lose her job because of the possible

3

diagnosis and that he would not share the information with anyone else. The Plaintiff continued to perform her regular job duties and did not request any accommodation or changes because of her potential HIV status.

The Plaintiff was scheduled to work the weekend shift that included Friday, May 13 through Sunday, May 15. The Plaintiff had previously requested May 14 off so that she could move, but the request was denied because the Plaintiff was still in her probationary period and because the request was for a weekend shift. The Plaintiff reported for her shift on Friday, but was not feeling well. She had difficulty breathing, a sore throat, and tightness in her chest. Around 2:00 AM, Chin sent the Plaintiff home.

The following morning, the Plaintiff called the Defendant's facility and spoke with Jody Hudson, a first shift nurse, to inform him that she was sick, planned to visit a walk-in clinic, and would not be working her shift that night. Hudson informed the Plaintiff that she should submit a doctor's note. The Plaintiff went to a walk-in clinic where she was diagnosed with strep throat and received a slip from her doctor stating that she should be excused from work for that day—May 14. According to the Plaintiff, she called Hudson back to relay her diagnosis, and then brought the note to the Defendant's facility per Hudson's request. She also kept a copy of the note for herself.[2] The Plaintiff did not come to work on Sunday, May 15. Nor did she call to report her absence.

The Director of Nursing, Rachel Shaffer, and the Assistant Director of Nursing, Lori Smith, made the decision to terminate the Plaintiff's employment for violation of the Attendance

---

[2] The Defendant does not have a record of receiving the note on May 14. Its only record is a facsimile of the note which indicates that it was faxed on May 18.

Policy. Shaffer had been the Director of Nursing since late April 2016, and did not know about the Plaintiff's HIV status. Smith was also unaware of the Plaintiff's potential HIV status. On May 16, Smith called the Plaintiff to inform her that the Defendant was terminating her employment for violation of the Attendance Policy. The Plaintiff disputed that she could be terminated for her absence on Saturday because she was under a doctor's care. Smith told the Plaintiff she was being terminated due to her no call/no show over the weekend. Shortly thereafter, the Plaintiff arrived at the Defendant's facility, requesting to speak with Taylor. The Plaintiff told Taylor that she had a doctor's note for her absence, had only been absent one other time, and did not know of any other write ups. Taylor arranged for the Plaintiff to meet with Shaffer on May 18.

On May 18, the Plaintiff met with Shaffer, Smith, and Lisa Scott, a day shift nurse supervisor, to discuss her termination. This was the first time that Shaffer had met the Plaintiff. At some point in the meeting, the Plaintiff requested to step out of the meeting to speak with Shaffer alone. The Plaintiff explained to Shaffer why she believed that she should not have been terminated. Shaffer responded by pointing to the no call/no show over the weekend and write ups the Plaintiff had received. The Plaintiff informed Shaffer that her first absence, on March 29, was due to the information she received about the HIV screening. According to the Plaintiff, Shaffer did not reconsider the termination decision, but stated that the Plaintiff should not be working in health care with her medical issue.[3]

After the meeting, the Plaintiff wanted to obtain copies of the documents in her personnel

---

[3] The Plaintiff asserts that Taylor was standing beside her during this exchange, but Taylor states he was not involved in the May 18 meeting.

file. The Plaintiff's encounter with the human resources employee in possession of her file escalated to the point where the Plaintiff took her file and left, tearing up its contents as she walked out of the facility.

## ANALYSIS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Although the court must construe all the facts and reasonable inferences in favor of the plaintiff, as the nonmoving party, this favor "does not extend to drawing inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and brackets omitted). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).

**A.  Disability**

To prevail on her disability discrimination claim, the Plaintiff must show that, when the Defendant terminated her employment, it did so based upon a disability within the meaning of the ADA. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015); 42 U.S.C. § 12112(a) (providing that no "covered entity shall discriminate against a qualified individual on the basis of disability"). Discrimination claims may be reviewed on summary judgment under

the direct or the burden-shifting methodologies that have developed under employment law. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (ADA claim). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court should assess the case in those terms. *David*, 846 F.3d at 224; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that the *McDonnell Douglas* burden-shifting analysis has not been displaced). When the plaintiff does not present her argument in opposition to summary judgment in those terms, the direct method of proof is the "default rule." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)). Under that method, the test is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [adverse action]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (setting out the standard for avoiding summary judgment on discrimination claim under the direct method of proof). In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer . . . discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Here, the Plaintiff has responded to the Defendants motion for summary judgment using the direct method of proof.[4] The Plaintiff must show that a genuine issue of material fact exists as to the following elements: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job; and (3) her employer took an adverse job action against her on the basis of her disability. *Bunn*, 753 F.3d at 683; *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). With regard to the first prong, the Plaintiff does not claim that her HIV status substantially limits her in any major life activity. The Plaintiff maintains that she meets the definition of disability provided in the ADA because she was "regarded as having" such an impairment. 42 U.S.C. § 12102(1). An individual is "regarded as having" an ADA disability "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). This prong of the definition of disability is designed to "cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (internal quotations omitted). For

---

[4] Although the Plaintiff references a prima facie case and goes through the burden shifting analysis, the Plaintiff does not submit any evidence for one of the elements of a prima facie case under the indirect method. *See Hooper*, 804 F.3d at 853–54 (noting that Hooper's failure to present "evidence of similarly situated individuals" was "sufficient to end the inquiry under the indirect method, as it is Hooper's responsibility to identify and present evidence of a comparator at the summary judgment stage") (first citing *Bunn*, 753 F.3d at 685; then citing *Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014)); *see also Ferrill*, 860 F.3d at 499–500 ("The *McDonnell Douglas* framework is just 'a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent.'" (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015)). To the extent the Plaintiff intended the two comparators that she identifies for her race discrimination claim to count as the similarly situated employees for her ADA claim, the Court will address that evidence during its discussion of her Title VII claim. In any event, as stated above, the ultimate legal inquiry remains the same, regardless of the method of proof employed.

example, it is enough under the "regarded as" prong to show that an employer failed to hire an applicant because it believed, rightly or wrongly, that he would be a safety risk. *See* 29 C.F.R. pt. 1630, App. § 1630.2(l ) (2016) ("[A]n employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled.").

Because the Plaintiff is proceeding under the "regarded as" definition of a disability, and because that definition builds causation into the definition of disability, *see* 42 U.S.C. § 12102(3) (requiring that the plaintiff be subject to a prohibited action "*because of* an actual or perceived physical or mental impairment") (emphasis added), the Plaintiff's third element causation arguments are subsumed within her discussion of the first element. The Plaintiff also incorporates into her ADA claim an analysis of pretext. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (noting that evidence that would permit a reasonable factfinder to conclude that disability was the reason for termination might include "evidence that the employer offered a pretextual reason for an adverse employment action") (quoting *Bunn*, 753 F.3d at 684). The Court will consider these arguments, and the record before it, to determine whether there is admissible evidence from which a jury could conclude that the decision makers were aware of her HIV status, regarded her as unable or unfit to perform her job because of it, and terminated her employment as a result of those perceptions.

The Plaintiff maintains that there is sufficient evidence from which a reasonable jury could find that the Director of Nursing, Shaffer, regarded her as disabled. The Plaintiff points to Shaffer's purported statement to the Plaintiff on May 18 after the Plaintiff informed Shaffer that

she might be HIV positive. According to the Plaintiff, Shaffer responded by telling the Plaintiff that she should not be working in the healthcare field. While the Court must accept as true for purposes of summary judgment that Shaffer made this statement, a jury would also have to consider the fact that Shaffer purportedly made this statement two days *after* the Plaintiff was informed of her termination. Accordingly, the Plaintiff's termination could not have been based on Shaffer's beliefs about the Plaintiff's condition, which she only learned about after the decision had been made and communicated to the Plaintiff.

In an attempt to create a genuine dispute regarding the time line, the Plaintiff argues that

> a reasonable inference can and should be drawn in favor of [the Plaintiff] that Shaffer knew that [the Plaintiff] was HIV positive when she made the decision to terminate her and signed the Employee Separation Report—just as Taylor knew that [the Plaintiff] was HIV positive when he signed the Employee Separation Report alongside of Shaffer. It is reasonable to believe that Shaffer and Taylor discussed [the Plaintiff's] HIV status and termination prior to signing the report.

(Pl.'s Br. 9 (citation to Statement of Genuine Dispute ¶¶ 15–16, 63–64 omitted).) The evidence does not bear this out.

According to Taylor's Declaration, he did not tell anyone about the Plaintiff's HIV status, and he was not involved in the decision to terminate the Plaintiff's employment. (Taylor Decl. ¶¶ 7, 11, ECF No. 24-6.) Shaffer submits in her Declaration that Shaffer, along with Assistant Director of Nursing Smith, made the decision to terminate the Plaintiff's employment, and that she was not aware of the Plaintiff's HIV status when she made the decision. (Shaffer Decl. ¶ 11–12, ECF No. 24-4.) The Plaintiff's speculation that these sworn statements are not true does not create a genuine dispute. She must present evidence to the contrary by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

10

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c).

It is pure conjecture that, because Taylor signed the Employee Separation Report, "alongside of Shaffer," that "Shaffer and Taylor discussed [the Plaintiff's] HIV status and termination prior to signing the report." (Pl.'s Br. 9.) "The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones." *Parker v. Fed. Nat'l Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984). The signatures would not create a reasonable inference that Shaffer and Taylor discussed the Plaintiff's HIV status—yet the signatures are *all* that the Plaintiff points to. Further, Shaffer's signature is not even on the Report.

The Plaintiff's own description of the May 18 encounter undermines her claim that Shaffer knew about her HIV status on May 16 when she made the termination decision. In her deposition, the Plaintiff described Shaffer's reaction when the Plaintiff was disputing that she violated the attendance policy and first told Shaffer that her March absence was due to the possibility of being diagnosed with HIV. (Pl.'s Dep. 91, ECF No. 29-1.) The Plaintiff testified that Shaffer looked at her, "stepped back, and . . . basically told [her] she is sorry, [you're] terminated" and should not be working in the facility and in health care with HIV. (*Id.*). The Plaintiff describes a reaction that seems to confirm that Shaffer was hearing about the Plaintiff's HIV status for the first time on May 18. At the very least, there is nothing in the testimony that creates a reasonable inference otherwise. Notably, the Plaintiff's deposition testimony also confirms that, before the Plaintiff mentioned anything about HIV, Shaffer had been focused solely on the fact that the Plaintiff had write ups and had been a no call/no show. (*Id.*)

The record, then, consists of Taylor's sworn declaration that he did not inform anyone of

the Plaintiff's HIV status, Shaffer's sworn declaration that she did not know of the Plaintiff's status when she made the decision to terminate the Plaintiffs' employment, and the Plaintiff's speculation that, because Taylor signed the Employee Separation Report, that he also told Shaffer about the Plaintiff's HIV status. On this record, there is no "reasonably contestable" dispute that Shaffer was unaware of the Plaintiff's HIV status when she made the decision to terminate the Plaintiff's employment. *See SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009) (noting that genuine evidentiary disputes are those that are "reasonably contestable" such that a "reasonable jury could find for either party") (first quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997), then citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Turning her attention to Taylor, the Plaintiff speculates that Taylor's signature on the Employee Separation Report means that Taylor was a "decision maker involved in her termination and may have terminated" the Plaintiff's employment "because she had reported to him that she was HIV positive." (Pl.'s Br. 9.) The Employee Separation Report required the Department Manager Signature and the Administrator Signature. (Report, ECF No. 29-6.) Smith signed as the Department Manager, and Taylor signed as the Administrator. (*Id.*) The Plaintiff does not explain how Taylor's signature renders him a decision-maker, especially in light of the fact that when she disputed the basis for her termination, he directed her to Shaffer.

Even if he was a decision-maker, by all accounts, Taylor did not have any issues with the Plaintiff's continued employment based on her HIV status. The Plaintiff testified that when she informed Taylor that she was in the process of being tested because it was possible she was infected with HIV he

> let me know, you know, everything is okay, you know. He has seen a lot in his years and that I would be fine and there is nothing to worry about, *I won't lose my job*, they have medication for stuff like this, people live long lives and, you know, he was glad to have me back on board, you know, if I need anything let him know. If I need time off, let him know. . . . [H]e just really kept letting me know *I won't lose my job over this* and I have nothing to worry about because they have medication and that I will be fine, because I let him know my viral load according to BioLife was so low that it can't be passed.

(Pl.'s Dep. 38 (emphasis added).) Taylor did not suggest any changes to the Plaintiff's job or her job duties as a result of the Plaintiff's disclosures. (*Id.* at 39.) There is no evidence in the record to suggest that Taylor did not stay true to his assurances that the Plaintiff would not lose her job because of the possible diagnosis, or that he would not share the information with anyone else.

Undeterred by the evidence that Shaffer did not know about her HIV status until May 18, the Plaintiff argues that "a reasonable jury could infer that Shaffer's attitude toward [the Plaintiff's] impairment resulted in [the Plaintiff's] termination—no matter when Shaffer actually learned of [the Plaintiff's] impairment." (Pl.'s Br. 8–9, ECF No. 28.) This is so, according to the Plaintiff, because Shaffer was presented with the opportunity to void the termination on May 18 when the Plaintiff presented her argument that she did not commit a no call/no show violation. Under the Plaintiff's theory, the discriminatory employment action that was taken against her based on perceptions regarding her HIV status was Shaffer's failure to void the termination and "admit[] the mistake" regarding her attendance. (*Id.* at 8.)

The Plaintiff has not presented evidence of pretext or any other basis that would permit a jury to believe that Shaffer's refusal to rescind the Plaintiff's termination on May 18 was due to her HIV status. To establish pretext, the plaintiff must "present evidence suggesting that the employer is dissembling." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (citation omitted). Pretext "involves more than just faulty reasoning or mistaken judgment on the part of

the employer; it is [a] lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015)). Merely disagreeing with an employer's reason does not meet this standard. *See Liu*, 817 F.3d at 316 ("'The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered' for the adverse action." (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011))). "[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

Accordingly, to create a triable issue under this theory, the Plaintiff must present evidence that it was a mistake, as she claims, to count her May 14 absence against her, or to consider her a no call/no show. Secondly, she must present evidence from which it can be inferred that Shaffer had reason to believe that this was a mistake, and that the reason she did not reverse the termination decision upon learning of the mistake was because the Plaintiff informed Shaffer about her HIV status on May 18.

The Employee Separation Report, dated May 16, 2016, identifies "quit-no notice" based on a no call-no show for the weekend shift as the basis for her termination. "Insubordination" and "refusal of work assignment" are also marked on the Report as reasons for the separation. In the additional comments section, the Report refers to an attachment. The attachment is a Disciplinary Action Form, dated May 16 and signed by Smith, which references an attendance violation on May 14. Smith wrote that the Plaintiff had requested time off for Saturday, May 14,

14

but the Director of Nursing denied the request. The Plaintiff then called in sick for the shift. Smith wrote that, "according to Saber Policy, this is to be treated as a NCNS. You also made it clear that you would not be coming to work." (Disciplinary Action Form, ECF No 29-7.) Together, the two documents memorialize that the Defendant was absent for her weekend shift, and that she had called in sick for Saturday after her earlier request to be absent that day was denied. They also memorialize that Smith, who was not aware of the Plaintiff's HIV status, believed this was a violation of the Attendance Policy and could be construed as a no call/no show.

The undisputed facts from the record are that, according to the Night Shift Master Schedule for May 8 through May 21 (ECF No. 24-3 at 90), the Plaintiff was scheduled to work on May 13, 14, and 15. On March 13, the Plaintiff was sent home early due to illness. She did not work the next two days. She did not call the facility to report her absence on Sunday, May 15.

The Plaintiff argues that the Defendant's characterization of her absence on Saturday, May 14 as a no call/no show is not supported by the Attendance Policy or the facts. The Defendant's own disciplinary record shows that the Plaintiff called on Saturday to report her absence, and the Attendance Policy does not contain any provision to convert her call-in to a no call/no show. The Court agrees that there is some confusion regarding the May 14 absence, at least as to why Smith wrote that it could be construed as a no call/no show. But it is clear that, during the first ninety days of employment, the only absences that do not count against an employee's attendance record are for bereavement, jury duty, or leave under the Family Medical Leave Act. (Attendance Policy, ECF No. 24-3 at 88–89.) The Plaintiff's May 14 absence thus

15

counted against her three absences within the probationary period that would result in immediate termination of employment. (*Id.*)

It may have been that the decision makers (Smith and Shaffer) believed that the Defendant's absence on May 14 was sufficient to terminate her employment under the Attendance Policy. The Disciplinary Action Form, which is attached to the Employee Separation Report, seems to suggest this. As does the employer's position statement filed in response to the Plaintiff's EEOC charge. The Plaintiff had previously request to have May 14 off, but the request was denied. It may also be that this belief was mistaken, and that it was not until May 15 that the Plaintiff had committed sufficient violations to justify termination under the Attendance Policy. It may also be that the decision makers did consider the Plaintiff's May 15 absence when they made their decision on May 16. The Employee Separation Report, signed on May 16, 2016, states that the Plaintiff was no call/no show for the "weekend shift" without parsing any of the dates. This the same reason that Smith gave the Plaintiff when she called her on May 16. What is most important for purposes of this Court's review of the discrimination claim, is that any mistakes or inaccuracies in the separation papers were already in existence on May 16—before Shaffer had any knowledge of the Plaintiff's HIV status.

The Plaintiff has not presented any reason to believe that Shaffer's decision to stand by the May 16 termination decision when the Plaintiff met with Shaffer on May 18 was due to her HIV status as opposed to Shaffer's beliefs about the Plaintiff's attendance violations. By May 18, Shaffer knew that the Defendant had accrued a second absence on May 14. She also knew that the Plaintiff did not come to work on May 15, or call in to report her May 15 absence. She had violated an actual policy, one that had been communicated to her in writing. Even if the

16

Plaintiff presented compelling argument to Shaffer that her May 14 absence was not grounds for termination, she has not presented any reason—apart from speculation—to believe that Shaffer would have reversed the decision except for the fact that the Plaintiff informed her about her HIV status. If the reason for the termination was a mistaken one, it was not converted to a discriminatory one by the Plaintiff's disclosure, particularly where the Plaintiff had accrued three absences within the probationary period.

Shaffer's reason, both before and after she learned of the Plaintiff's HIV status, was her attendance issues from the weekend. If the decision maker "honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Little v. Ill. Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004).

B.  **Race Discrimination**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Having considered the totality of the evidence, the Court finds that, even when the Plaintiff is given the benefit of reasonable inferences, she has not set forth sufficient evidence that would allow a reasonable jury to infer race discrimination was behind the Defendant's decision to end her employment. *See Bass*, 746 F.3d at 840 ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

The Plaintiff has offered no evidence from which a reasonable factfinder could infer that her race was a factor in the decision to terminate her employment. The Plaintiff has not identified

any comments having a racial character or purpose made either in connection with the Defendant's decision, or by a person involved in the decision. The Plaintiff's race was never mentioned during, or in conjunction with, any action taken toward her. The Defendant's evidence shows that it has terminated many employees, both Black and White, for attendance related violations, especially during their probationary period. (Marvin Decl. ¶ 7, Ex. X., ECF No. 24-2.)

The Plaintiff claims that employees outside of her protected class were treated more favorably than she was treated, and designates her deposition testimony in support. Her testimony, however, contains no foundation to establish that she has personal knowledge that Mike Sloan, a Caucasian third-shift CNA was a no call/no show on more than one occasion during his probationary period and not terminated. Nor is there any explanation how she knows that Christina Mitchell, a Caucasian co-worker she claims was often late, was not subjected to adverse employment actions. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

Not only is there no foundation from which to conclude that the Plaintiff possessed personal knowledge about these employees' actions or the Defendant's response, her deposition testimony on these matters is not supported by specific incidents. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (stating that conclusory allegations, unsupported by specific facts, will not create genuine issues for trial); *cf. Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (stating that an affidavit presented in opposition to summary judgment "should have recounted factual instances, based upon [the affiant's] personal knowledge"). "The purpose

of the 'similarly-situated' comparator is to ensure that all other variables are discounted so that discrimination can be inferred." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012). Without any admissible evidence regarding specific instances of comparable misconduct, the Plaintiff cannot claim that she "engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 939–40 (7th Cir. 2003); *see also Monroe*, 871 F.3d at 507 (stating that the similarly situated comparator must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them") (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).[5]

The Plaintiff attempts to shift the burden of proof on this matter, claiming that, because the Defendant "has provided no records to the contrary, [the Plaintiff's] allegations must be taken as true." (Pl.'s Br. 11.) Summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004). Here, it is the Plaintiff who must present that evidence. The Plaintiff has not presented admissible evidence to show that Sloan and Mitchell are valid comparators.

The Court has undertaken "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Harper v. C.R. England, Inc.*,

---

[5] The Plaintiff, in fact, testified that Mitchell came to work late, not that she was a no call/no show or had accumulated three absences during the probationary period. (Pl.'s Dep. 120–23.) The Plaintiff's testimony about Sloan was that he stopped showing up to work and quit. (*Id.* 123.)

687 F.3d 297, 306 (7th Cir. 2012) (noting that a genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party). The Court finds that no reasonable juror would be able to conclude from the evidence that the Defendant's decision to terminate the Plaintiff's employment was motivated by her race.

**CONCLUSION**

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 23]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on May 15, 2018.

          s/ Theresa L. Springmann
          CHIEF JUDGE THERESA L. SPRINGMANN
          UNITED STATES DISTRICT COURT